OPINION
Defendant-appellant Robert Hayes appeals from his conviction and sentence for Rape and Gross Sexual Imposition, arguing that: (1) his convictions are against the manifest weight of the evidence; (2) the prosecutor engaged in misconduct by improperly bolstering the credibility of the alleged victim, Hayes' stepdaughter, K.M., by appealing to the jury's emotions, and by commenting in closing argument upon his exercise of his right to remain silent; and (3) his trial counsel provided him with ineffective assistance of counsel.
We conclude that Hayes' convictions are not against the manifest weight of the evidence; the prosecutor did not improperly bolster K.M.'s credibility, appeal to the jury's emotions, or comment on Hayes' exercise of his right against self-incrimination; and Hayes has not shown that his trial counsel provided him with constitutionally ineffective assistance. Accordingly, the judgment of the trial court is Affirmed.
 I
In March 2000, Hayes was charged with two counts of Rape and one count of Gross Sexual Imposition. One of the Rape counts was accompanied by a specification charging that Hayes purposely compelled his victim to submit by force or threat of force. The charges stemmed from allegations that Hayes sexually molested his step-daughter, K.M., who was approximately eight years old at the time of the alleged offenses. Hayes was tried on the charges in August 2000. The State presented the testimony of K.M., J.H., who is K.M.'s mother and Hayes' wife, several law enforcement officers, and K.M.'s therapist, Jody Bishop-Phipps. Hayes testified in his own behalf and presented the expert testimony of Dr. James Barna, a licensed psychologist. The jury acquitted Hayes of one Rape charge, but convicted him on the remaining Rape charge, along with its accompanying specification, and on the Gross Sexual Imposition charge. The trial court sentenced Hayes to a life term of imprisonment for his Rape conviction, and to a five-year term for his Gross Sexual Imposition conviction, ordering that the sentences be served concurrently. Additionally, the trial court classified Hayes as a sexual predator.
Hayes appeals from his conviction and sentence for Rape and Gross Sexual Imposition.
 II
Hayes' First Assignment of Error states:
 THE CONVICTIONS OF APPELLANT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Hayes implicitly acknowledges that the State presented sufficient evidence on each element of the offenses on which he was convicted. Nevertheless, he asserts that the jury "lost its way" in convicting him of Rape and Gross Sexual Imposition, and, therefore, his convictions on those charges are against the manifest weight of the evidence. We disagree.
In determining whether a criminal conviction is against the manifest weight of the evidence, [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.[1]
In reviewing the weight of the evidence, the witnesses' credibility and the weight to be given their testimony are matters primarily for the trier of fact,[2] since the trier of fact is in the best position to judge the witnesses' credibility by observing their demeanor.[3] When a verdict is challenged on either sufficiency or weight of the evidence grounds, the verdict will not be reversed unless the appellate court finds that reasonable minds could not reach the conclusion drawn by the trier of fact.[4]
Hayes argues that the jury's decision to acquit him on one of the Rape charges, in which he allegedly forced K.M. to perform oral sex upon him under a blanket on the living room couch, just a short distance away from the kitchen where her mother and brothers were staying, demonstrated that "[t]he jury disbelieved the circumstances surrounding this alleged rape and determined that it never happened[.]" Hayes contends that the "incongruity" between the acquittal on this count and the guilty verdicts on the two others is unreasonable standing alone, because, according to Hayes "[t]here can be no set of circumstances that can explain" why [K.M.] would be fabricating one incident, and yet truthful as to the remaining two. However, that the jury chose to acquit Hayes on one of the Rape counts does not necessarily demonstrate that the jury chose to disbelieve K.M., with respect to that incident; instead, it could mean that the jury concluded the incident probably occurred, but found that Hayes had established reasonable doubt with respect to that charge. In any event, the jury's finding that there was reasonable doubt as to that charge did not mandate an acquittal with respect to the remaining charges.
Hayes argues that his conviction on the Gross Sexual Imposition charge is contrary to the manifest weight of the evidence, because "in all probability [he] wasn't even at home at the time when [K.M.] says the incident occurred." However, the wording of Hayes' own argument demonstrates that he failed to present an airtight alibi regarding that offense, which, like the other two charges, occurred some time between January 1999 and March 2000. Indeed, Hayes himself acknowledged that he did not work on the weekends for the first eight to nine months of 1999, and that even thereafter, he had almost all Sundays off, and occasionally other days off as well. Hayes also acknowledged that there were times when he would be left alone with the children so J.H. would be able to run errands.
Hayes also argues that his conviction on the remaining Rape charge is against the manifest weight of the evidence because that incident allegedly occurred when K.M. "elected" to go to her own home to get a drink of water, knowing that he would be there, even though K.M. had testified that "she and her brothers customarily did not like to go into their home when only [he] was there, because [he] is not very `nice'." However, once again, as indicated by the wording of Hayes' own argument, it was not shown that K.M. would never go into her home when she knew that Hayes would be there alone. It was not implausible for the jury to believe that K.M. would return to her own home for a drink of water, even knowing that her step-father, whom she considered to be not "nice," would be there.
Hayes asserts that K.M.'s testimony was not credible because she exhibited none of the "traditional signs" of having been sexually molested; e.g., sudden behavioral changes, nightmares, or fear of him. However, K.M.'s treating therapist, Jody Bishop-Phipps, testified that K.M. did exhibit symptoms of having been sexually abused, including being angry or hostile toward adults and other children, being unwilling to sleep in her own room, not eating, and having conflicting feelings towards Hayes. Bishop-Phipps also testified that not every child who has suffered sexual abuse exhibits the types of behaviors cited by Hayes, and that sometimes the symptoms do not manifest themselves until long after the events. Even Dr. Barna, Hayes' expert witness, testified that children who have been sexually abused do not always exhibit the symptoms to which Hayes refers.
Hayes also asserts that K.M. "was shown to have been inconsistent in her `truthful' answers[,]" pointing out, that while K.M. denied having asked her mother about sex between two men, and could not remember having told her mother that she did not want to live with Hayes, J.H. confirmed that K.M. had, in fact, said these things to her. However, these discrepancies did not make K.M.'s allegations so unworthy of belief as to render the jury's guilty verdicts against the manifest weight of the evidence. Indeed, while testifying about one of the alleged incidents of sexual abuse, K.M. stated that Hayes "squirted stuff" on her that was "warm," "white," "runny," and "sticky." K.M. also testified that when Hayes put his tongue in her mouth, it tasted like tobacco, and "was disgusting." She also described Hayes' penis by saying that before she performed oral sex upon him, "it was like hanging down and then when [she] put it in [her] mouth it sticks straight up." Although Hayes contends that K.M. could have learned about these things from fellow schoolchildren, this argument is unconvincing in light of the details K.M. provided in her testimony.
Hayes' First Assignment of Error is overruled.
 III
Hayes' Second Assignment of Error states:
 THE STATE IMPROPERLY FOCUSED ON AND BOLSTERED THE CREDIBILITY OF THE ALLEGED CHILD VICTIM
Hayes argues that the prosecution improperly bolstered K.M.'s credibility during its direct examination of Bishop-Phipps and Mrs. Hayes, and during its cross-examination of Dr. Barna.
 A
Hayes argues that Bishop-Phipps was unqualified to testify about child sexual abuse, and that the sole purpose of her testimony was to corroborate the veracity of K.M.'s allegations. We disagree.
A witness may testify as an expert if: (1) his testimony relates to matters beyond the knowledge and experience of lay persons, or dispels a common misperception held by lay persons; (2) the witness is qualified to give expert testimony by virtue of his specialized knowledge, skill, experience, training, or education regarding the subject matter at issue; and (3) the witness' testimony is based on reliable scientific, technical, or other specialized information.[5] While it is improper for an expert to offer an opinion whether an alleged victim of child sexual abuse is telling the truth, the expert may testify whether the alleged victim's behavior is consistent with that normally observed in sexually abused children.[6]
Bishop-Phipps was shown to be qualified to testify as an expert on matters of child sexual abuse. She has earned a master's degree in marital and family counseling, and is a licensed professional clinical counselor. She has practiced as a therapist for over six years, counseling approximately 300 children, including ones who have been sexually abused. Furthermore, Bishop-Phipps never stated an opinion whether K.M. was telling the truth regarding her accusations against Hayes. And the fact that Bishop-Phipps testified that she was treating K.M. did not constitute improper bolstering, but, instead, was appropriate to explain the basis of her knowledge of K.M., and her circumstances.
 B
Hayes argues that the State improperly bolstered K.M.'s credibility through J.H.'s testimony by having her give hearsay testimony regarding statements K.M. made to her about the alleged incidents of sexual abuse, and by asking her how she felt when she heard K.M.'s allegations, to which J.H. answered, "devastated."
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[7] Here, J.H.'s testimony regarding the statements K.M. made to her was not admitted for the purposes of establishing the truth of the matters asserted, since J.H. did not give a detailed statement regarding what K.M. had related to her, but instead, only sufficient information to demonstrate how the crime became known, and why J.H. took the actions she did, which included bringing the crimes to the attention of law enforcement officials through her pastor. Additionally, J.H.'s regarding what K.M. told her helped explain K.M.'s delay in making her accusations against Hayes, because it showed that K.M. was not awakened to the significance of Hayes' acts until she heard a sexual conversation between her classmates on the school bus. It should also be noted that K.M. did testify at trial, and was subjected to cross-examination by the defense.
The prosecutor's question to J.H. asking her how she felt after hearing K.M.'s allegations, to which J.H. replied "devastated," was arguably relevant to show why J.H. first called her pastor rather than law enforcement officials. In any event, even if it was error for the trial court to allow this question, the error was harmless beyond a reasonable doubt, since the jury could hardly have been surprised by J.H.'s reference to having been devastated, in view of her other testimony. As the State notes, even if J.H. had not been inclined to credit her daughter's accusations against her husband, the mere fact that the accusations were being made would be devastating to any normal wife and mother.
 C
Hayes argues that the State improperly bolstered K.M.'s credibility through its cross-examination of Dr. Barna, by asking him a hypothetical question that, according to Hayes, asked him to comment on K.M.'s credibility.
Barna testified that K.M.'s interview with law enforcement personnel had been "contaminated" by her mother's questioning her about the incidents, and by the investigators' use of leading questions during the interview. On cross-examination, the prosecutor asked Barna if K.M.'s ability to describe the characteristics of semen in detail was indicative of a child who had been sexually abused, assuming that K.M. did not learn about the characteristics of semen from any source other than her alleged experience with Hayes. However, even if this question constituted an attempt at improper bolstering, Hayes could not have suffered any prejudice by it, because Barna never answered the State's hypothetical question, but refused to accede to the State's request that he assume K.M. did not learn about the characteristics of semen from someone other than Hayes.
Hayes further alleges that Bishop-Phipps was not qualified to rebut Barna's testimony. However, while Bishop-Phipps acknowledged that she has not been trained as a "forensic interviewer," she testified that she was trained to use the same guidelines and procedures in her therapy sessions with sexually abused children that investigators are supposed to use, e.g., to avoid using leading questions, to ensure that the child knows the difference between right and wrong, and to ensure that the interview occurs as soon as possible after the initial disclosure. The trial court did not abuse its discretion when it held that the interview techniques used by forensic interviewers and therapists are sufficiently similar to allow Bishop-Phipps to express an expert opinion concerning the efficacy of the techniques used by law enforcement personnel while interviewing K.M.
Hayes' Second Assignment of Error is overruled.
 IV
Hayes' Third Assignment of Error states:
 THE STATE IMPROPERLY APPEALED TO THE SYMPATHY AND EMOTION OF THE JURY.
Hayes argues that the trial court committed reversible error by allowing J.H. to testify under direct examination that she felt "devastated" when K.M. disclosed to her that Hayes had sexually molested K.M. Hayes asserts that this testimony had no relevance to the case, and that the State elicited it solely for the purpose of appealing to the jury's emotions by creating sympathy for K.M. We disagree.
As stated previously, J.H.'s testimony was arguably relevant for the purpose of showing why she called her pastor first, rather than the police. Furthermore, even if it was error for the trial court to allow this testimony, it was harmless beyond a reasonable doubt. The trial court instructed the jury to consider all of the evidence presented and to make its findings without bias, sympathy, or prejudice. The jury could not have been surprised to learn that J.H. was "devastated" upon hearing K.M.' s allegations against her husband. Significantly, the jury acquitted Hayes of one of the Rape counts, suggesting that the jurors did not allow their decision to be influenced by their emotions.
Hayes' Third Assignment of Error is overruled.
 V
Hayes' Fourth Assignment of Error states:
 THE STATE COMMITTED PROSECUTORIAL MISCONDUCT IN ITS CLOSING ARGUMENT BY IMPROPERLY INVITING THE JURY TO OVERLOOK THE PRIVILEGE AGAINST SELF-INCRIMINATION.
Hayes alleges that the prosecutor engaged in misconduct when, in his closing argument, he insinuated that the jury should find Hayes guilty because he failed to express or proclaim his innocence when first confronted by police with K.M.'s accusations.
At trial, Officer Kevin Banks testified that when Hayes was told of K.M.'s allegations against him, he began shaking, sobbing, and vomiting, and stated that he was "going to lose [his] job." During his closing argument, the prosecutor stated that Hayes' only comment in response to the allegations was that he was going to lose his job, and described Hayes' reaction as being strongly indicative of someone who "had just got caught." Hayes argues that this amounted to the State commenting on the fact that he chose to remain silent when confronted by the police with K.M.'s accusations, and, therefore, violated his privilege against self-incrimination. We disagree.
The privilege against self-incrimination guarantees to an individual the right to remain silent, unless he voluntarily chooses to speak during a custodial interrogation, at trial, or in the course of an official investigation.[8]
Here, Hayes did not move to suppress any statements he made to police, nor did he object to Banks' testimony. The prosecutor's comments were predicated on the evidence he presented at trial regarding Hayes' conduct and the statements Hayes made upon learning of K.M.'s accusations; they were not about Hayes' choice to remain silent in the face of K.M.'s allegations, since Hayes did not choose to remain silent.
Hayes' Fourth Assignment of Error is overruled.
 VI
Hayes' Fifth Assignment of Error states:
APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE.
Hayes' argues that his trial counsel provided him with constitutionally ineffective assistance of counsel by failing to object to certain questions asked by the prosecutor.
To demonstrate that his counsel provided him with ineffective assistance of counsel, a criminal defendant must show that his attorney's performance was deficient in that it fell below an objective standard of reasonableness, and that he was prejudiced by that deficient performance in that a reasonable probability exists, that if it were not for counsel's errors, then the outcome of his trial would have been different.[9] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[10]
First, Hayes alleges that his trial counsel was ineffective for failing to object to certain leading questions that the prosecutor asked K.M. during her direct examination, which directed K.M. to speak about the three specific instances that formed the basis of the charged offenses.
Leading questions should not be employed on direct examination of a witness unless they are necessary to develop the testimony.[11] The decision whether or not to permit a leading question is a matter committed to the broad discretion of the trial court,[12] and this is particularly true where the witness is young.[13] Leading questions directing a witness' attention to the topic of inquiry are permitted.[14]
Here, the questions that Hayes asserts should have drawn objections from his trial counsel merely directed K.M.'s attention to the topic of inquiry. Allowing them was well within the trial court's discretion. Therefore, Hayes' trial counsel's failure to object them did not constitute a performance error.
Hayes also faults his trial counsel for failing to object when the prosecutor asked J.H. if K.M. may have overheard her conversation with her pastor, which would have "informed" K.M. "as to the substance" of her allegations against him, thereby enhancing the credibility of K.M.'s trial testimony. But Hayes failed to state on what basis his trial counsel should have objected to this question. The only plausible objection that occurs to us is that whether K.M. might have overheard her mother's conversation with the pastor was not within J.H.'s knowledge, but the possibility of K.M.'s having overheard the conversation could have been within her mother's knowledge, depending upon the circumstances, so that it is not clear from this record whether this objection, had it been made, would have had merit. Therefore, even if counsel's failure to object to this question was a performance error, Hayes has failed to demonstrate that there is a reasonable likelihood that the outcome of his trial was affected by it.
Hayes' Fifth Assignment of Error is overruled.
 VII
Hayes' assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF., P.J., and GRADY, J., concur.
[1] State v. Martin (1983), 20 Ohio App.3d 172, 175, cited in State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
[2] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
[3] Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
[4] State v. Jenks (1991), 61 Ohio St.3d 259, 273.
[5] Evid.R. 702.
[6] State v. Stowers (1998), 81 Ohio St.3d 260.
[7] Evid.R. 801(C).
[8]State v. Stephens (1970), 24 Ohio St.2d 76, paragraph one of the syllabus.
[9] Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674.
[10] Id.
[11] Evid.R. 611(C).
[12] State v. Lewis (1982), 4 Ohio App.3d 275, 278.
[13] See State v. Brown (1996), 112 Ohio App.3d 583, 599.
[14] Id.